IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 24, 2018

## ROBERT EDWARD FRITTS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Anderson County
No. B5C00377      Donald Ray Elledge, Judge**

_____

## No. E2017-00996-CCA-R3-PC

_____

Petitioner, Robert Edward Fritts, was convicted of first degree murder and received a sentence of life without the possibility of parole. *See State v. Robert Edward Fritts*, No. E2012-02233-CCA-R3-CD, 2014 WL 545474, at *1 (Tenn. Crim. App. Feb. 10, 2014), *perm. app. denied* (Tenn. Sept. 19, 2014). Petitioner's conviction was affirmed on direct appeal. *Id.* Petitioner subsequently sought post-conviction relief on the basis of a multitude of allegations of ineffective assistance of counsel. The post-conviction court denied relief after a hearing. After a complete review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

William F. Evans, Jacksboro, Tennessee, for the appellant, Robert Edward Fritts.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Dave S. Clark, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

Petitioner was convicted after a jury trial of the March 6, 2007 first degree premeditated murder of his mother-in-law, Teresa Busler. *Id.* In order to adequately

address the issues presented in this appeal from the denial of post-conviction relief, a brief discussion of the facts as introduced at trial is necessary. Petitioner and his wife, Dawn Fritts, lived with the victim and the victim's husband, Steve Busler. *Id.* Mrs. Fritts was the daughter of the victim. Mrs. Fritts had a child from a previous relationship, and the victim had custody of the child, who was six years old at the time of the murder. Petitioner and Mrs. Fritts had a volatile relationship. Mrs. Fritts was staying with a friend at the time of the murder. On the day of the murder, Mr. Busler was at work from early that morning until around 5:00 p.m. When he left for work, Petitioner, the victim, and the victim's granddaughter were at home. When Mr. Busler returned home, the house was unlocked and the victim's body was in the bedroom where there was blood "all over the bed and walls." *Id.* at *2. Mr. Busler ran next door and called 9-1-1. *Id.*

According to Mr. Busler, the only weapons in the home were a hatchet and a small knife which he ordinarily kept under the bed in the master bedroom. The victim died as the result of a brutal beating, including a large "chop-type injury" to the back of the head caused by a "hatchet, an axe, or a machete." *Id.* The victim suffered at least eleven different blows to the head, bite marks, and "hickey[s]" and the cause of death was "multiple sharp and blunt force injuries to the head" that could have been caused by a hatchet. *Id.* at *2, 12.

Crime scene officers processed the bloody scene, taking note that it appeared that someone had tried to clean up the crime scene because towels, a "red substance" and some "hard objects" that appeared to be portions of bones were found in the washing machine. *Id.* Petitioner voluntarily came to the sheriff's office for an interview prior to his arrest. *Id.* at *5. Investigators noticed stains on Petitioner's clothing. Petitioner's clothing was collected and tested. The bloodstains on Petitioner's clothing matched the victim's blood. Petitioner gave a statement in which he claimed that he was called in to work at Arby's that morning and started to walk to work before he decided that he did not want to go to work and hitched a ride to the mall. *Id.* at *6-7. When Petitioner left the house, he left his wife's child in the home with the victim. He claimed that they were both asleep when he left the house. In a second statement, Petitioner admitted that he lied about being called in to work but denied any involvement with the death of the victim. *Id.* at *8.

Evidence was introduced at trial that Petitioner was a fan of the Insane Clown Posse band and member of a gang associated with the band. Petitioner had a tattoo of a "hatchet man," a symbol associated with the band and gang, on his arm. *Id.* at *10. Detective Thomas Walker, an expert on gangs, testified that Petitioner was a member of the Insane Clown Posse gang because he displayed behavior consistent with gang members. *Id.* Gang members often painted their faces white. White spray paint was found on a shirt belonging to Petitioner and on the face of the deceased victim.

Petitioner's journal contained song lyrics from Insane Clown Posse songs as well as song lyrics written by Petitioner. Dustin Dalton, a former cellmate, testified that Petitioner wrote song lyrics about "hacking" out someone's brains and told him that he "snapped" when he killed the victim and when he "came to, she was dead." *Id.*

During the investigation, Mr. Busler identified a hatchet found in the attic of the home as the hatchet that was ordinarily kept under the mattress of his bed. *Id.* at *3. Petitioner's shoe print matched a partial bloody print found in the home and the bloodstains on Petitioner's pants matched the blood of the victim. *Id.* at *13. Blood from the hatchet was consistent with the victim's blood. Petitioner did not testify at trial. *Id.* at *14.

On direct appeal, Petitioner argued that the trial court improperly allowed the State to introduce expert testimony regarding his gang affiliation and that the evidence was insufficient to support the conviction. *Id.* at *1. This Court disagreed, determining that Petitioner's "affiliation with the I[nsane] C[lown] P[osse] gang was relevant and admissible because it assisted the jury in identifying him as the perpetrator and established his motive for the offense. *Id.* at *16 (citing *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3-4 (Tenn. Crim. App. June 27, 2001), *no perm. app. filed*). This Court also examined the evidence and determined that it was sufficient to support the conviction. *Id.* at *19-20.

Petitioner filed a pro se petition for post-conviction relief on September 4, 2015, alleging that he received ineffective assistance of counsel and that "other grounds" entitled him to post-conviction relief. The post-conviction court appointed counsel and an amended petition was filed. In the amended petition, the following were raised as grounds for relief: (1) trial counsel was ineffective for failing to object to the introduction of numerous photographs; (2) trial counsel was ineffective for failing to object to the introduction of several exhibits; (3) trial counsel was ineffective for failing to object to the testimony of inmate Dustin Dalton; (4) trial counsel was ineffective for failing to object to the testimony of Robin Ward; (5) trial counsel was ineffective for failing to obtain a handwriting expert to examine the journal; (6) trial counsel was ineffective for failing to object to the introduction of the journal; (7) trial counsel was ineffective for failing to object to the introduction of a photograph of the victim and her husband; (8) trial counsel was ineffective for failing to object to prosecutorial misconduct during the State's closing argument; (9) trial counsel was ineffective for failing to call a forensic scientist to testify for the defense; (10) trial counsel was ineffective for failing to elicit testimony from Dawn Fritts that she attempted to gain access to the house from the back door after the victim was killed; (12) trial counsel was ineffective for failing to pursue a theory of second degree murder; (13) trial counsel was ineffective for failing to present

evidence of mental state at the sentencing hearing; (14) petitioner's due process rights were violated; and (15) the cumulative effect of the errors resulted in an unfair trial.

The post-conviction court held a lengthy hearing on the petition for relief. At the hearing, trial counsel testified that he was appointed to represent Petitioner at trial. Trial counsel was licensed to practice law in 1994 and devoted 95 percent of his practice to criminal defense. At the time of the post-conviction hearing, trial counsel was death penalty certified and had handled over twenty-five murder trials.

Trial counsel filed several motions prior to trial, including a motion to exclude photographs. Trial counsel recalled the introduction of several pictures of the victim's body in which "brain matter" was clearly visible. Trial counsel explained that in a typical case, there would be a "conference prior to trial to address the issues of the photographs." In fact, trial counsel thought that there was a hearing prior to trial in Petitioner's case as well as a conference at the bench during trial with regard to several sets of photographs, though he "d[id] not have an independent recollection" about the specifics at the time of the hearing. Trial counsel maintained that the defense strategy was that Petitioner "did not commit this offense." Trial counsel went on to explain that this trial strategy led to "no white-washing the fact that this victim was brutally murdered."

Trial counsel "vaguely" recalled the introduction of the 9-1-1 tape into evidence. On cross-examination, trial counsel recalled that the 9-1-1 tape was actually beneficial to the defense because Mr. Busler was "frantic" during the beginning of the tape and "calm" toward the end of the tape. According to trial counsel, the 9-1-1 tape helped to make Mr. Busler look suspicious. Trial counsel admitted that the crime scene videos were introduced into evidence. Trial counsel reiterated that Petitioner "was insistent on his defense that he was not the culprit or did not murder this particular woman in this particular case." Trial counsel also explained that in his opinion the videos showed that "the TBI did such a sloppy job . . . that there was maybe some hope of casting doubt on some aspects of the validity of their investigation." Trial counsel went on to explain that the video showed that there were a "number of cats . . . crawling all over the body during the course of their investigation" and "spatters of blood either from the actual crime . . . or from the cats walking on top of the victim."

Trial counsel remembered that a number of jail house "snitches" were subpoenaed to testify against Petitioner at trial. However, he did not "have an independent recollection" of the specifics of the testimony of those witnesses, specifically Dustin Dalton's testimony. Trial counsel explained that the record would show that he attempted to attack Mr. Dalton's credibility by impeachment.

Trial counsel did not recall the testimony of Robin Ward, a coworker of the victim who testified that the victim was afraid of Petitioner. Trial counsel recalled the introduction of a journal into evidence at trial and how it indicated Petitioner's interest in the Insane Clown Posse as well as notes that appeared to be written back and forth between Petitioner and his wife. Trial counsel explained that he "did a lot of research" on the band. Trial counsel explained that the lyrics to their songs were "graphic" and that the journal contained song lyrics from actual songs as well as lyrics that Petitioner appeared to have "drafted himself along the line of the themes portrayed in [I]nsane [C]lown [P]osse songs in this notebook." Trial counsel maintained that the journal and Petitioner's "involvement as it relate[d] to the [I]nsane [C]lown [P]osse . . . had nothing to do with the killing of [the victim]." With regard to the journal, trial counsel could not recall which witnesses attributed which pages of the journal to Petitioner. Trial counsel admitted that he did not object to Special Agent Andy Corbitt reading portions of the journal into evidence and was unable to articulate a reason for which he could have objected at trial.

Trial counsel admitted that he did not object to the introduction of the photograph of the victim while she was alive, noting that it was typical for courts to allow this type of photograph in order to "give some historical perspective to the jury." Trial counsel did not have a valid reason to object to the testimony.

Trial counsel admitted that he did not object during the prosecutor's closing argument but explained that he was familiar with the prosecutor involved in the case and her penchant for drama. Trial counsel explained that it was customary for him to "advise juries [during closing argument] that [he] should have taken more drama classes when [he] was in college" and that the arguments of the lawyers were not evidence.

Trial counsel maintained that the trial strategy employed during the entirety of the trial was that Petitioner did not commit the crime. In fact, Petitioner insisted that he was not responsible for the victim's death and was not there when the victim died. Therefore, trial counsel explained that testimony from Terry Labor, a crime scene expert, explaining that he could not determine the length of time the victim was on the bed prior to getting to her final resting position was irrelevant because Petitioner maintained that he did not commit the crime.

Trial counsel recalled testimony at the trial about the back door to the residence being propped or forced open about one week after the murder. Trial counsel testified that he did not "think that issue was relevant" to the defense and therefore did not pursue who was suspected of breaking into the house.

Trial counsel explained that he contemplated other defense strategies at trial, including pursuing a second degree murder conviction. However, trial counsel explained that in order to pursue a second degree murder conviction Petitioner would have to acknowledge that he was the perpetrator and "he was never willing to do that." Trial counsel mentioned second degree murder in his closing argument in order to give the jury something "to hang their hat on if, in fact, they believed [Petitioner] was the culprit."

Trial counsel testified that Rhonda Lakin was the mitigation expert hired by trial counsel to investigate sentencing. Trial counsel reviewed school psychological evaluations prior to trial. Trial counsel also arranged for Petitioner to be evaluated by a forensic psychologist prior to trial. Trial counsel chose not to utilize testimony from any of the mental health professionals at trial because Petitioner's own mother gave "testimony . . . about his disabilities and issues related to that" and trial counsel doubted that mitigation testimony "would have been well received by the jury."

Trial counsel did not believe that he did anything at trial that would support a claim of ineffective assistance of counsel. Trial counsel recalled his frustration with the fact that Petitioner would not "pursue this case as a second degree murder" case.

Petitioner testified at the hearing. Petitioner explained that he met with trial counsel's investigator on two occasions. Petitioner denied writing any of the lyrics in the journal that was introduced at trial. Petitioner admitted that he wrote in the journal, claiming that the only items in his handwriting were the letters between him and his wife. Petitioner maintained that he informed trial counsel several times that he did not write the lyrics. Petitioner admitted that trial counsel got at least two witnesses, his wife and his mother, to testify that it was not his handwriting in the journal. Petitioner denied drawing the upside down cross appearing in the journal and denied being a Satanist. Petitioner complained that trial counsel only called one witness at trial. Petitioner admitted that he told trial counsel he did not want to argue second degree murder at trial because he denied any involvement with the murder but now complained that trial counsel did not pursue a theory of second degree murder.

At the conclusion of the hearing on the petition for post-conviction relief, the post-conviction court commented that the case was "well" remembered by the court because the facts were "candidly the worst of any murder case [the court] had ever been involved in, either as an attorney, an observer in the crowd, or a judge." The post-conviction court was perplexed as to why the State did not seek the death penalty. The post-conviction court noted trial counsel's qualifications to represent Petitioner and trial counsel's use of professionals hired through the Administrative Office of the Courts. With regard to the individual issues raised in the "most complete post-conviction petition" that the court had ever ruled on, the post-conviction court commented on each issue in turn, ultimately

- 6 -

concluding that Petitioner was not entitled to relief. The post-conviction court specifically commented that trial counsel "did all he could do with what he had" and that there was "no evidence" presented at the hearing of deficient performance. Trial counsel "hired and consulted with experts . . . hired and consulted with a private investigator . . . examined those witnesses on appropriate points . . . objected at appropriate times . . . filed appropriate motions . . . [and] did everything he could do."

Petitioner filed a timely notice of appeal.

*Analysis*

*A. Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). On appeal, this Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). This Court will not re-weigh or re-evaluate the evidence presented or substitute our own inferences for those drawn by the trial court. *Henley*, 960 S.W.2d at 579. Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *Momon*, 18 S.W.3d at 156 (citing *Henley*, 960 S.W.2d at 578). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields*, 40 S.W.3d at 458.

*B. Ineffective Assistance of Trial Counsel*

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Burnett v. State*, 92 S.W.3d 403, 408

(Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This Court will not use hindsight to second-guess a reasonable trial strategy, *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994), even if a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

### *I. Failure to object to the introduction of photographs*

On appeal, Petitioner complains that trial counsel was ineffective for failing to object to the following photographs that were introduced as exhibits at trial: 11-16, 18, 19(B)-(D), 33(B)-(C), 37(B)-(G), 87(B)-(P), 88, 95-97, 102-103, 113, and 115. Petitioner also complains that trial counsel failed to object to Collective Exhibit 20 and Collective Exhibit 167. Specifically, Petitioner complains that the photographs, DVDs, and PowerPoint presentation were largely cumulative, certainly gruesome, and most definitely inflammatory which resulted in prejudice because the jury was lead "to want to

convict based on emotion." The State argues that Petitioner failed to prove prejudice where the evidence against Petitioner was overwhelming.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402. Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *Vann*, 976 S.W.2d at 102-03; *see also* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). Certainly photographs of crime victims who suffer serious bodily injury are, by their very nature, prejudicial; however, a prejudicial photograph is not per se excludable. Evidence which is unfairly prejudicial, having an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one is excludable. *Banks*, 564 S.W.2d at 951. "The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (quoting *Banks*, 564 S.W.2d at 950-51). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts.). In *Banks*, the Supreme Court gave trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. "Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

At trial, during a jury out hearing, Dr. Adele Lewis, a forensic pathologist, testified with regard to many of the photographs about which Petitioner now complains. During the initial jury-out hearing, the trial court started to examine each individual photograph numbered 88-107. Trial counsel explained that he did not object to the photographs for the purposes of the jury-out hearing, explaining that he "didn't necessarily have a problem" with the introduction of the photographs if they were entered

for a purpose other than to cause the jury to be inflamed. The trial court determined that it could not make a determination as to the admissibility of the photographs without going through the doctor's testimony in the jury-out hearing and chose instead to allow the State to attempt to introduce the photographs one by one during the testimony of the doctor. At that time, trial counsel would have the ability to object to each individual photograph if he so desired.

The jury was called back in and the testimony of the medical examiner began. The record reflects that trial counsel did not object to trial exhibits 11-16, 18, 19(B)-(D), 33(B)-(C) , 37(B)-(G), 87(B)-(P), 88, 95, 96, 97, 102, 103, and 115, all depicting various images of the victim's body both at the crime scene and during the autopsy. Trial counsel objected to trial exhibit 104 (a photo depicting the victim's head injuries). The trial court held a jury-out hearing, during which the trial court found trial exhibit 104 duplicitous of trial exhibits 37 E and F. The trial court ordered a portion of trial exhibit 104, depicting brain matter, redacted. The trial court commented during the hearing that there were "audible sounds" from the jury as some of the pictures were shown. Trial counsel also objected to trial exhibit 113 (a photo of the victim lying face down on the morgue table depicting the victim's left shoulder with crescent shaped bruises indicating bite marks). The trial court overruled the objection. Collective trial exhibit 20 contained two DVDs of the crime scene and was introduced through the testimony of a member of the crime scene team. The DVDs included visual representation of items identical to those depicted in photographs admitted through the medical examiner and blood spatter analysis expert. Collective trial exhibit 167 contained a PowerPoint presentation of many of the same photographs that had already been introduced into evidence. This exhibit was introduced during the testimony of the blood spatter analysis expert in order to explain her conclusions with regard to the manner of death of the victim.

At the post-conviction hearing, trial counsel testified that it was his practice to object to highly prejudicial photographs. Trial counsel also explained that Petitioner's "position throughout the course of this trial was that he did not commit this offense" so trial counsel did not find "white-washing the fact that this victim was brutally murdered" to be a good or reasonable trial strategy. Trial counsel also commented that the DVDs of the crime scene helped to show the "sloppy" job that the officers did during the investigation, including the fact that there were numerous cats wandering through the crime scene. Trial counsel opined that it was beneficial for the defense to cast light on the inadequacy of the investigation. The post-conviction court accredited the testimony of trial counsel, stating:

> [O]n failing to object to certain photographs; the [c]ourt ruled to the admission of each of these photographs in this case. And the [c]ourt would remind counsel that under State versus Davidson, 509 S.W.3d 156, in

murder prosecution post mortem photographs can be helpful to show how the victim died and the nature of the injuries inflicted before death.  These pictures can be relevant to the issue of deliberation or pre-meditation.  Intent to kill may be inferred from the brutality of the attack.  The succession of blows, the patently vicious manner they are inflicted.  The enormity of the cruelty and the horrendous injury suffered provide evidence of willful execution of an intent to kill.  That's exactly, I've never had a case like this.  Again, I've never had one like this.  It was horrific. . . . [T]he [c]ourt made a ruling at the time.  Counsel made the appropriate objections.  The [c]ourt allowed only those photographs as it pertained to the scene of the crime that the [c]ourt deemed appropriate for the reasons as set out in State versus Davidson.

There has been no testimony today of exhibits that would inflame the jury, other than the implication that the photographs would inflame the jury.

We have viewed the photographs and exhibits in question.  Without a doubt, there are many gruesome and horrific photographs contained within the technical record.  However, it would be difficult, if not impossible, in our view for any photograph depicting such a brutal murder to be anything but horrific.  The victim in this case, no doubt, was murdered with unnecessary cruelty and savageness.  In our view, the admission of exhibits 19, 37, 87, 88, Collective Exhibit 20, and Collective Exhibit 167 in particular could be viewed as needlessly cumulative when combined with the overwhelming evidence of guilt and the ability of the medical examiner and other experts to testify as to the sheer atrocity of the victim's death without the addition of these photographs.  Despite our characterization of the photographs, however, we take note that seasoned trial counsel reviewed the photographs and made the strategic decision not to accentuate the seriousness of the offense by repeatedly objecting to evidence based on the fact that Petitioner repeatedly insisted that he was not the perpetrator of the crime.  The fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The post-conviction court determined that trial counsel "exhausted" his investigation of the case and the court accredited trial counsel's testimony before concluding that trial counsel was not ineffective for failing to object to the photographs, DVDs, and PowerPoint presentation.  The post-conviction court also discussed the overwhelming evidence pointing to Petitioner's guilt, including the fact that the pants and shoes worn by Petitioner at the time he was questioned contained the victim's blood.  Moreover, Petitioner did not introduce any testimony at the hearing to show how he was

prejudiced by the introduction of the photographs or that the outcome of the proceeding would have been different had the photographs been excluded.  Petitioner has failed to meet his burden with regard to this issue and is not entitled to relief.

## *II.  Failure to Object to the Introduction of 9-1-1 Tape*

Petitioner takes issue with the fact that trial counsel failed to object to the introduction of the 9-1-1 tape at trial, claiming that it was irrelevant hearsay and that trial counsel was ineffective for failing to object to its admission.  The State disagrees.

The tape of the 9-1-1 call was introduced during the testimony of Mr. Busler.  He testified that he found the victim and ran next door to call 9-1-1 because the home did not contain a landline.  In the 9-1-1 tape, Mr. Busler first sounds frantic.  Towards the end of the call, Mr. Busler sounds calm.  Mr. Busler was initially interviewed as a suspect in the crime.  Trial counsel explained that he wanted the jury to hear the call because it helped to "point the finger" at someone else for the crime where the defense theory was that Petitioner was not the perpetrator.  The post-conviction court determined that the 9-1-1 tape "candidly put a dent in the State's proof" because Mr. Busler "started out emotional but ended up calm."  However, the post-conviction court concluded that Petitioner failed to prove that trial counsel was ineffective for failing to object to the introduction of the tape.  We agree.  Petitioner's has failed to show how the introduction of the tape was prejudicial.  Petitioner is not entitled to relief on this issue.

## *III.  Failure to Object to the Testimony of Inmate Dustin Dalton*

Petitioner complains that trial counsel was ineffective for failing to object to the testimony of Dustin Dalton.  Without citing any authority to support his position on appeal, Petitioner argues that the testimony was "very prejudicial in that it supported the prosecution's argument that the petitioner wrote . . . graphic lyrics [similar to the songs of the Insane Clown Posse band] in his journal. . . ."  The State disagrees.

At the hearing on the post-conviction petition, trial counsel explained that he determined prior to trial that Mr. Dalton's testimony was admissible and attempted to use Mr. Dalton's criminal history and status as an inmate to impeach his testimony.  In fact, trial counsel was able to call two witnesses during the defense proof who testified that the writing in the journal did not belong to Petitioner.

The post-conviction court determined that trial counsel made appropriate objections to Mr. Dalton's testimony and that it was for the jury to determine how the testimony of the inmate was perceived.  The post-conviction court accredited the testimony of trial counsel in this regard.  Again, witness credibility, is resolved by the

post-conviction court. *Momon*, 18 S.W.3d at 156 (citing *Henley*, 960 S.W.2d at 578). Petitioner has failed to show prejudice and is, therefore, not entitled to relief on this issue.

### IV. Failure to Object to and/or Prevent the Testimony of Robin Ward

Petitioner also takes issue with trial counsel's failure to prevent the testimony of Robin Ward, a coworker of the victim. At trial, prior to the testimony of Ms. Ward, trial counsel lodged an objection on the basis that the testimony was hearsay. During a jury-out hearing, the trial court determined that Ms. Ward's testimony that the victim told her she was afraid of Petitioner was admissible. At the post-conviction hearing, the post-conviction court noted that there was "an 803 hearing" during which the court ruled the testimony admissible. The post-conviction court determined that trial counsel acted appropriately by objecting to the testimony and having a hearing. The fact that the objection itself was unsuccessful does not render counsel's actions ineffective assistance. The post-conviction court determined that Petitioner failed to meet his burden and was not entitled to relief. We agree. Petitioner has failed to show how trial counsel's actions resulted in prejudice.

### V. Failure to Obtain a Handwriting Expert and/or Object to the Introduction of the Journal

Petitioner insists that trial counsel was ineffective for failing to obtain a handwriting expert to examine the journal and form an opinion as to who wrote the entries. The State insists that trial counsel was not ineffective in this regard because trial counsel introduced testimony to show that it was not Petitioner's handwriting.

At the hearing, trial counsel testified that he called Petitioner's wife and mother who both testified that there were portions of the journal that were not written by Petitioner. Trial counsel opined that this was the best strategy to discredit the authenticity of the journal where there were clearly entries written by more than one person rather than to risk an expert coming to the conclusion that Petitioner himself authored all of the entries in the journal pertaining to murder and mayhem.

The post-conviction court determined that trial counsel did "the best thing he could have done" by cross-examining Petitioner's own mother and wife and getting proof into the record that some of the handwriting in the journal did not belong to Petitioner. In fact, the Tennessee Supreme Court recently recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick v. State*, 454 S.W.3d 450, 475 (Tenn. 2015). Trial counsel herein made the strategic decision in this case to forego a handwriting expert. Again, this Court will not use hindsight to second-

guess a reasonable trial strategy. *Adkins*, 911 S.W.2d at 347. Petitioner has failed to show that trial counsel was ineffective in utilizing this trial strategy. Consequently, Petitioner is not entitled to relief on this issue.

## VI. Failure to Object to the Introduction of a Photograph of the Victim and her Husband

Petitioner insists that trial counsel should have objected to the admission of a photograph of the victim while she was alive. The post-conviction court determined that Petitioner was not entitled to relief based on trial counsel's failure to object to the introduction of a photograph of the victim and her husband. Trial counsel testified that the trial court ordinarily allowed these types of photos to "give some historical perspective to the jury in deciding the case." The post-conviction court noted that it was the "law in Tennessee" that parties can "introduce" such photographs into evidence. While we recognize that the Tennessee Supreme Court has held that these types of photographs are ordinarily irrelevant and fraught with the ability to arouse sympathy in the minds of jurors, the introduction of photographs taken during the life of a victim are not so prejudicial as to warrant a new trial. *See, e.g. State v. Adams*, 405 S.W.3d 641, 657-58 (Tenn. 2013) (citing *State v. Cole*, 155 S.W.3d 885, 912 (Tenn. 2005)). Moreover, Tennessee Code Annotated section 40-38-103 permits the introduction of "an appropriate photograph of the victim while alive . . . to show the general appearance and condition of the victim while alive" in a "prosecution for any criminal homicide." The photograph herein depicted the victim and her husband. Petitioner has failed to establish that trial counsel's failure to object to the introduction of the photograph was prejudicial. Petitioner is not entitled to relief on this issue.

## VII. Failure to Object to the State's Closing Argument During Both the Guilt and Sentencing Phases

Petitioner complains that trial counsel failed to object during closing arguments when the prosecutor stated that in her opinion Petitioner thought the victim was dead, started to clean up the scene, saw the victim move, said "oh my God, she's still alive!", and then continued to beat her with the hatchet. Petitioner also argues that trial counsel should have objected during the sentencing phase when the prosecutor suggested that the victim moved after she was initially beaten and felt "pain." The State disagrees, arguing that trial counsel explained that he was familiar with the prosecutor's argument style and addressed it in his own closing rather than objecting and drawing attention to the dramatic style employed by the prosecutor.

Specifically, Petitioner is complaining about trial counsel's failure to object to the following argument:

At that point he takes the hatchet and he starts hitting her on the head. I think she goes unconscious, she's bleeding bad lying there in the blood and I think he thinks she's dead. So he goes off and starts to clean up things and he comes back and sees her move. Why do we know she moved? We know that she laid on that bed for six to eight minutes because that blood spatter person told you it takes six to eight minutes to coagulate and you've got that coagulation on the bed and that big pool of saturation. That blood handprint is either the defendant's handprint where he's bracing himself while he swings. Or maybe it's [the victim's] eking up every ounce of energy she can to push herself up. We know that her blood[y] head, a very, very bloody object, dropped those drops of blood on the envelopes and on the counter and down this dresser. This was a very, very bloody move. I submit to you this evidence suggests that she somehow gets herself up, she is bleeding over all of this, she falls maybe to her knees because we've got more blows delivered down and the defendant said, on, my God, she's still alive! And that's when he just whales away.

During the sentencing phase, the prosecutor commented that Petitioner tired himself out during the beating and had to rest, that it was "something that went on for a while." She also commented that Petitioner "beat her here – from the spatter – and then he finished her off. She moved. Consciousness, feeling, pain, wicked behavior."

Trial counsel explained at the post-conviction hearing that he was familiar with the prosecutor's argument style and chose to address her penchant for drama in his own closing rather than objecting to her theories of the case. It is clear that trial counsel strategically decided that it was better to refrain from an objection rather than to object and potentially draw more attention to the matter. Additionally, trial counsel knew that the jury would receive an instruction that argument was not the same as evidence. The post-conviction court reviewed the jury instructions during which the court told the jury that the "statements, arguments or remarks of counsel are intended to help you in understanding the evidence and applying the law but they are not evidence. The jury instructions also told the jury that to disregard "statements [that] were made that . . . [were] not supported by the evidence." The post-conviction court determined that Petitioner failed to show prejudice in light of the overwhelming proof of guilt in this case. We agree. Petitioner cannot say that the result of the proceedings would have been different if the State's closing argument or sentencing argument were excluded. Petitioner has failed to meet his burden and is not entitled to relief on this issue.

*VIII. Failure to Call Terry Labor to Testify for the Defense as a Forensic Serologist*

Petitioner argues on appeal that trial counsel should have called Terry Labor to testify as a forensic serologist to rebut the testimony from the State's expert that the victim laid on the bed for six to eight minutes after her initial injury. Specifically, Petitioner points to Mr. Labor's conclusion that the "length of time" the victim was on the bed prior to the final resting position on the floor "could not be determined." Petitioner insists that his testimony would have cast doubt on the prosecution theory.

At the post-conviction hearing, trial counsel testified that he did not call Mr. Labor as a witness because he determined that the testimony would be more helpful to the State than to the defense. Trial counsel again explained that Petitioner insisted that he did not commit the offense and that Mr. Labor's testimony did not assist in advancing this theory. The post-conviction court accredited the testimony of trial counsel in this regard, concluding that it was a trial strategy and noting that there was overwhelming evidence that Defendant committed the crime. The evidence does not preponderate against the post-conviction court's conclusion with regard to this issue. Additionally, we note that Petitioner failed to call Mr. Labor to testify at the post-conviction hearing. Without his testimony, Petitioner cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Petitioner is not entitled to relief on this issue.

### IX. Failure to Object to and Elicit Testimony from Mrs. Fritts

Petitioner argues on appeal, without citing any authority to support his proposition, that trial counsel was ineffective for failing to object to the testimony of Mrs. Fritts that an upside down cross, as seen on the back of Petitioner's journal "can mean bad things, possibly satanic things." Additionally, Petitioner complains that trial counsel failed to elicit testimony from Mrs. Fritts that she was the person who attempted to gain entry to the scene of the murder about one week after the murder, allowing the State to "paint [Petitioner] as a cold-hearted killer that was returning to the scene to collect evidence or harm the victim's husband."

At the hearing, Petitioner testified that he told trial counsel that he did not attempt to gain entry to the house after the murder. Trial counsel testified that whether someone tried to break in to the house a week after the murder was not relevant to the ultimate question of who murdered the victim. With regard to the drawing on the journal, trial counsel testified that he did not want to draw any unnecessary attention to the symbol or suggest to the jury that it was somehow important and that objecting to Mrs. Fritts's testimony might somehow make it seem important. Again, the post-conviction court accredited the testimony of trial counsel and determined that trial counsel "exhausted" his

investigation of the case. The evidence does not preponderate against the judgment of the post-conviction court that trial counsel made a strategic decision with regard to the testimony of Mrs. Fritts. Moreover, Petitioner has failed to show how any alleged failure of trial counsel resulted in prejudice. Petitioner is not entitled to relief on this issue.

### X. Failure to Pursue a Theory of Second Degree Murder

Petitioner argues that trial counsel was ineffective for failing to pursue a theory of second degree murder. Specifically, Petitioner claims when Mr. Dalton testified Petitioner "snapped," the jury could have found Petitioner guilty of the offense of second degree murder and that trial counsel was ineffective for failing to advance this theory. The State disagrees, countering that trial counsel honored Petitioner's wishes.

Trial counsel testified that Petitioner insisted that he did not commit the crime. In trial counsel's opinion, the only way to get second degree murder in front of the jury would be for Petitioner to admit that he killed the victim. Trial counsel expressed regret that he was unable to convince Petitioner to pursue this defense at trial. Trial counsel acknowledged that he mentioned second degree murder during closing argument but was of the opinion that if he argued too strongly for a second degree murder conviction it would contradict the defense theory of the case.

The post-conviction court noted that Petitioner maintained his innocence. The court again accredited trial counsel's testimony, determining that trial counsel thoroughly investigated the case and developed a trial strategy coinciding with Petitioner's wishes. Petitioner has failed to show prejudice as a result of this trial strategy. As a result, Petitioner is not entitled to relief on this issue.

### XI. Failure to Present Evidence of Mental State at the Sentencing Hearing

Petitioner argues that trial counsel was also ineffective for failing to call Dr. Vance R. Sherwood or school psychologist Michelle Dawson to testify that Petitioner was "emotionally disturbed" when he was eighteen years of age and to "otherwise show that [Petitioner] was emotionally disturbed." The State posits that Petitioner's claim fails because he did not present either witness at the hearing on the post-conviction petition.

Trial counsel testified at the hearing that after reviewing a report from Dr. Sherwood, he made the determination that the report would have been more beneficial to the State's case than Petitioner's case. Specifically, trial counsel recalled that the report indicated Petitioner failed to take responsibility for his own actions and instead fabricated explanations for his actions that he would then come to believe.

The post-conviction court noted that trial counsel consulted with various experts and determined that based on Petitioner's insistence that he did not commit the crime, and the trial strategy employed to advance that theory, there were no experts that would be beneficial at trial. Further, the post-conviction court agreed with trial counsel that Dr. Sherwood's testimony would have been more helpful to the State than to Petitioner.

Petitioner failed to call either Dr. Sherwood or Michelle Dawson to testify at the hearing. Therefore, he is unable to establish prejudice. *See Black*, 794 S.W.2d at 757. Petitioner is not entitled to relief on this issue.

### XII. Due Process

Petitioner complains on appeal that the post-conviction court violated his due process rights by refusing to admit the original trial transcripts as an exhibit to the post-conviction hearing. Petitioner also argues that the post-conviction court failed to listen to the 9-1-1 tape and failed to admit into evidence or consider investigative reports from the Tennessee Bureau of Investigation ("TBI") at the hearing. The State insists that Petitioner received a full and fair hearing on the issues presented in his petition and therefore, he is not entitled to relief.

First, we note that this Court can and does take judicial notice of the record of a petitioner's direct appeal to this Court. *McCracken v. State*, 529 S.W.2d 724, 726 (Tenn. Crim. App. 1975) (citing *State ex rel. Brown v. Newell*, 391 S.W.2d 667, 669 (Tenn. 1965); *Canupp v. State*, 460 S.W.2d 382, 383 (Tenn. Crim. App. 1970); *State ex rel. Leighton v. Henderson*, 448 S.W.2d 82, 83 (Tenn. Crim. App. 1969)). We have done so in this case, especially where it was necessary for the determination of the majority of the issues, which so heavily related to the introduction of trial exhibits and testimony at trial. There was no reason to admit a duplicate transcript unless there was some discrepancy in the transcript from the direct appeal. Neither party herein has argued that there is any discrepancy. Moreover, the post-conviction court commented that it remembered the trial and the 9-1-1 tape well. Petitioner insists for the first time on appeal that the TBI investigative reports were admissible as an exception to the hearsay rule and that the post-conviction court should have admitted investigative reports from the TBI into evidence. Other than citing the definition of hearsay, Petitioner fails to cite any authority to support his argument. Thus, this issue is waived. *See* Tenn. R. App. P. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

### XIII. Cumulative Error

Lastly, Petitioner argues that the cumulative errors committed by trial counsel, the trial court, and the post-conviction court somehow entitle him to relief. Because we have found no error entitling Petitioner to relief, we cannot find cumulative error. Petitioner is not entitled to relief on this basis.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____

TIMOTHY L. EASTER, JUDGE